Peck, J.,
dissenting:
I dissent from the opinion of the court just read, and in doing so I regret, from the little time allowed me for the purpose, that I cannot bring this opinion within a less compass.
The opinion of the majority concedes the facts that Captain Ferguson, an assistant quartermaster, under instructions from the Quartermaster General, assumed to reduce the charter rate of the Sylvan Shore, the vessel whose charter is involved in this controversy, from $200 to $100 per day, without the assent and concurrence of the owners, and that they had not notice of the reduction for a month and a half after it had been made; and that the information was first communicated to claimants at a time when they were in Washington, demanding what was due on the vessel; and that they thereupon protested against the reduction, and demanded the discharge of the vessel. It is further conceded that the right of an assistant quartermaster to reduce the rate fixed in the charter-party, without the assent and concurrence of the owners of the vessel, cannot be upheld.
These facts conceded, and the law thus stated as applicable to thein, it would seem that the decision of the court against the right of the claimants to recover had not much to rest upon.
To obviate the embarrassment which would logically follow from the above combination of facts and law, the court imply an acquiescence on the part of the claimants to the reduction in the price fixed by the charter-party, from the simple facts that accounts were stated from time to time for the service of the vessel by the defendants, at a reduced rate, for which receipts were given by claimants, in full of such accounts; presuming, from'these receipts, without other evidence, that a new and different bargain had been made between the parties about the hire of this vessel.
It has been said, or, if not said, it has been sometimes intimated, that a majority of the court have supported the conclusion that' receipts, such as those described, will be held to *223 conclude tbe signer, unless the receipts are overthrown by positive evidence, regardless of that which may be deduced from the contract existing between the parties. The contract, they •insist, is not to be used to explain the receipt or the conditions upon which it was given.
To state the conclusion more briefly, the receipt supersedes the old contract, and ipso facto substitutes a new contract for the old one. I do not understand that a majority of the court has in any other case agreed to this conclusion. An examination of the cases will show, as I think, that no three of the judges have united in the expression of such an opinion. Tet the opinion in this case seems to rest upon that hypothesis. It has been admitted law, for a time whereof man’s memory runneth not'to the contrary, that the payment of a lesser sum cannot be satisfaction for the payment of a greater sum. In Pinnels Case, (5 Coke’s Rep., 117,) “it was resolved by the whole court that payment of a lesser sum on the day, in satisfaction of a greater, cannot be anj satisfaction for the whole, because it appears to the judges that, by no possibility, a lesser sum can be satisfaction to the plaintiff for a greater sum.”
From Coke’s time onward, I may say in every case where this question has been examined and considered, the same rule has been adopted and announced.
In support of this belief, I would refer to the numerous citations of the Chief Justice in the Reeside Case, (2 C. Cls. R., p. 1:) Bacon’s Abridgment, title Release, letter K; Pothier on Obligations, Evans’s translation, vol. 1, title Acquittances; vol. 2, p. 141, section 5. I am of opinion that the argument which assumes that the claimants are estopped from recovering an unpaid balance because they gave the receipts in question, is not warranted in or by any facts shown in this record. The receipts were in “full of the above account,” which admit the service, but do not state the' price agreed upon for the service, and state the amount less than the contract stipulated for.
A majority of the court insist that the objections made by the claimants to the reduction of the contract price should not avail them, because they were, not made to some officer in Washington, as if an officer in this place had different power or authority than he would have elsewhere. The officer is not indicated. The contract was made with Quartermaster Ferguson, and no other officer is named in it. Hence following *224 bis contract, claimant could not learn from it that be was to apply elsewhere for redress or to make complaint elsewhere than to the quartermaster who entered into it, as the agent of the United States. The law makes no distinction between the power of quartermasters relative, to contracts.
It is said in the opinion of the court that the claimants were in Washington, demanding their pay, previously earned, when notified of the reduction in the charter price of their vessel, and that when so notified they demanded her discharge, and protested verbally, as well against the reduction of price as the retention of the vessel; but nevertheless, it is inferred against the claimants that no proper objection was made. If any presumption springs from this statement, it would be, nothing appearing to the contrary, that the demand was actually made in Washington, of the proper officer and at the right place. The claimants would not be seeking their pay elsewhere than of the Quartermaster General, with any hope of getting it; and the presumption is thht they would look for their pay where it was reasonable to suppose it could be had. It is not probable they were making their demand of strangers, or protesting to such, or asking of them a discharge of their vessel. None but a lunatic would so act.
I deny that any -written protest was required of him. This is a new exaction, not warranted by any rule of law, and none is or can be cited to support it.
The opinion admits, and if it did not, the evidence shows, that the claimants protested to the very officer with whom the contract was made, and who had, by force of that instrument, authority to control the vessel, and who was to pay the charter price for the use of it, and who did pay all the sums receipted for, except one.
That officer was selected by the defendants to represent them, in so far as this charter-party is concerned, and an objection or lirotest made to him is all that should be exacted or required of claimants. They had no control over the selection of the agent; and they had a right to conclude that one had been appointed who would perform his whole duty toward his principal. The charter-party entered into by him had been accepted and ratified, and the claimants could not doubt or dispute the authority of the agent to do and accept all things in relation to it, whether in the nature of a protest or otherwise.
*225 Did these parties, claimants and defendants, stand upon an equality % The assumptions of the majority, by which alone their opinion is sustained, show to the contrary. Had this been a charter-party between John Doe and Bichard Boe, no such extraordinary' vigilance and conditions would I think be exacted. Hence it appears to me that this decision makes an advance toward establishing’ one rule of law for the government and another for the people.
The quartermaster who made the contract was authorized by the very instructions from his superior, referred to under date of 21st May, to discharge the vessel; and so the demand for her discharge was made of one who had authority to answer it. The words of the instruction are: “ You are directed to take stringent measures to reduce these expenses, by discharging all steamers whose rates appear to be excessive.”
The Quartermaster General did not decide as to what was excessive, but left that matter to the decision of the same officer who made the contract, and to whom the protest was made, showing his continued confidence in Captain Ferguson, admitting that he was not only a trustworthy agent but a trusted adviser.
How the defendants could have been misled or inqposed upon by these claimants, by their refusal to accept a part'in full of an entire sum due, which had been previously earned, and at a time when they were ignorant that any objection existed to their contract, is past my comprehension. For the time already past, no reason can be assigned with any force. For the time. then coming, they protested against reduction, never admitting, but always denying, the right of the defendants to reduce their compensation; thus forewarning the defendants that if they persisted in retaining the vessel, they could only do so upon the terms of the charter-party. Under these circumstances, how the acceptance of part payment could release the defendants, or practice any deception upon them, I am unable to comprehend. To infer that any deception was practiced, under this state of facts, is against all reason and propriety.
No consideration was given to support the release claimed. No fair dispute could or did exist as to what was rightfully due under the contract. The whole gist of the defence is, that might makes right, the government being much the strongest. No ingenuity or specious reasoning can show it otherwise.
*226 The defendants could and afterward did enter into a second charter-party,'for the hire of this vessel; which proves sufficiently that its agents were neither ignorant nor misled, and that they knew how to correct whatever was prejudicial to their interests in the first.
I do not urge that the defendants would neither pay the hire of the vessel, nor discharge her from service, and that coercion was used toward the claimants, upon presumption merely. The facts are proved. I cannot but marvel at the blindness or timidity which will not see the testimony and give it proper consideration.
An unimpeached and uncontradicted witness, who was employed by Quartermaster Ferguson, deposes as follows:
“ I remember when the charter rates were reduced.” * * * * * “We had a great deal of trouble with the owners of the Sylvan Shore about it, and it was the subject of a great deal of talk wdth steamboat men. It came to the knowledge of the owners of the Sylvan Shore about a month or two after the reduction took place, I think. They did not come down very often for their pay. Sometimes two or three months’ pay would be due. I don’t think that the reduction came to their knowledge until July, perhaps. We did not communicate with them at all on the subject, as we had no reason to. We expected them down in the ordinary course of events to get their pay. I don’t know whether it was Captain Martin or Captain George H. Powers that came down; it was one of these two. I never saw any of the other owners of the boat. The one wdio came down, when I informed him of the reduction, protested against it, and demanded that the boat should be discharged at once, and he was very much excited about it. I told him that he could not have the boat at that time; 'that we could not spare her. It was just the time we needed all our boats, for the army was in large force down below us. We had previously been picking out vessels and discharging all the transports we possibly could, in order to economize. I had made an extended tour some time previous to this order for reduction, with Captain Ferguson, to Aquia Creek, in February or March, and we had culled out the vessels, and discharged all the transportation we could possibly spare, under directions from the Quartermaster General. At the time of the reduction we had no boats to spare, particularly this boat, as she was very fast and could *227 run in shoal places. I know there was great feeling about it on the part of the owner of the boat, and he left in a state of great excitement, and would not take any money at the reduced rates. I was present at a conversation between Captain Ferguson and the owner, and they had hard words between them and parted with a good deal of feeling. I believe he said he would go up to Washington and see his member of Congress as to whether he could not get justice d,one him. It was hot long before he came back, and he told me that the military arm was too strong and he would have to submit; that his member of Congress advised him to hold his claim against the government in future.
“He offered to take the money before he went back, and to file a protest ; but that was objected to, as we in all cases declined to receive any written protest. The owners subsequently received .the reduced rates. They did not give me or Captain Ferguson to understand that they acquiesced in this reduction, but, on the contrary, they reiterated their demand. There was no good feeling between our department and these owners after that. They blamed us for the order, as we executed the law, and thought we were doing them great injustice by keeping-their boat. The matter remained in that way until the boat vras finally discharged, some six or seven months after the reduction, some time the next winter. There was no change in their attitude with regard to this matter that I saw until the boat was finally discharged. I saw very little of them after the reduction; they would come in, get their papers, and leave immediately.
“ Cross-examination by counsel for the government:
“Q. Did you hold any commission during the war ? — A. No, sir. I held a civil position. .
“Q. Had you any authority of your own at all'? — A. All my business was done through the quartermaster; I had no separate, jurisdiction from him.
“ Q. All your powers were derived from Captain Ferguson?— A. Yes, sir; entirely.
“Q. You had no .authority to do anything except what Captain Ferguson instructed you to do ? — A. No, sir.
“ Q. You yourself could neither release nor charter vessels ?— A. No, sir.”
One of the claimants was called upon to testify by the de *228 fendants, to show that the witness who thus deposed had some contingent interest in the result of this suit. Nothing was shown in that regard. It is to be remarked, however, that the defendants carefully avoided asking that claimant whether he ever accepted any of the payments-shown by the receipts, as a satisfaction of his demand.
Here is proof to offset against conjecture. The witness was in the service of the quartermaster, and spoke under his direction, and all the circumstances surrounding the transaction corroborate his evidence.
Objection was taken by the claimants in apt time to the admission as evidence of the circular letters of the Quartermaster General to his subordinates. These letters are made the basis of the decision arrived at by the majority of the court. I think they should be excluded. They do not come within any rule of evidence that I am aware of which should bind the claimants. They are ex parte / not a part of the res gestee; were not intended to be seen by or made known to the claimants,- were written long after the contract was in existence, and could only by accident, or the will or pleasure of another party, ever come to the knowledge of claimants.
If these circular letters contained the order or command of a superior officer to his inferior, and they had been obeyed, the claimants would not have had any cause of complaint. Their vessel would have been at once discharged, as the orders directed and the charter-party provided. The Quartermaster General did not see that his commands were obeyed, as it was his duty to have done, if he had the authority claimed for him.
The claimants on their part have not done any wrong. The whole fault is with the defendants. I insist that those who are in the wrong, rather than those who are innocent of wrong, shall suffer for their negligence, if there can be said to be any suffering in the premises.
The defendants now seek to profit by the disobedience of their orders by their agents, over whom they alone had authority, and of whom they only could exact observance. The innocent and powerless are forced, as I think, to submit to wrong and injustice in a case where they could not by any possibility, except by the help of the defendants, avert the cause which is now for the first time presented as a justification for the wrong inflicted.
*229 It is a novel doctrine to me that any party can avail himself of his own wrong to inflict injustice upon another.
To say that the claimants, without any other evidence to support the assertion than mere inference, when there is direct evidence to the contrary, were willing that their vessel should remain in the service at reduced rates, seems to me not only unreasonable, but at variance with all the rules of human action.
There is another question to which I will now refer as a point of difference between the majority of the court and myself.
A quartermaster is not a mere agent, or any agent in the proper sense, of the Quartermaster General exclusively; he is not delegated, deputed, or commissioned by him. An assistant quartermaster derives his power and authority from a higher source. He receives his commission from the United States, he gives his bond to the same power, takes an oath faithfully to perform his duties, which are such “ as shall be directed by the Secretary of War.” (See 1 Brightley’s Digest, page 64, section 89.) Nor is the Quartermaster General liable for any money or property that may come into the hands of the subordinate ■ officers of his department. (See same book, page 65, section 95.) An assistant quartermaster may, whenever in his opinion the exigency justifies, act upon his own responsibility and independently, and the Quartermaster General cannot dismiss him from service, though he may select another in his stead. A quartermaster is also controlled by his commanding officer in the field, whether the Quartermaster General approves or disapproves. An assistant quartermaster is no more an agent than the Quartermaster General; both are agents of the law, subordinate to the War Department, and a contractor or an assistant quartermaster might each in turn have to inquire whether the instruction given was authorized by the War Department before any action could safely be taken under any order or direction of the Quartermaster General. The difference between quartermasters is more in rank than in authority.
Seasoning from analogies, there is none known to the law that will so well enable courts to judge of the duties of an assistant quartermaster as the rules relating to principal and agent. The relation of the different characters to each other is nevertheless widely different.
A person about to contract with his neighbor, acting as an *230 agent may inquire into bis authority, and must be limited by it. Not so with a quartermaster, whose only answer to such a question, if he condescended to give one, would be that his commission was his warrant. Who would think of inquiring further, by asking if the Quartermaster General had or had not given him additional authority to make the particular contract. All practice, all precedent, all reason would show that any investigation of that kind would be both absurd and futile.
I shall not attempt by any further argument to show that neither the Quartermaster General nor any assistant of his, with or without instructions from him, can or could abrogate or alter an executed contract fairly and legally entered into, and repeatedly recognized as such by the War Department, without the consent of the other contracting party.